1
2
3
4
5
6
7
8
9
10
11
12

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

KEITH CLARK,

                              Plaintiff,

       v.

KENNETH J. BRAITHWAITE,[1]

                              Defendant.

CASE NO. C18-5990 BHS

ORDER GRANTING IN PART
AND DENYING IN PART
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

13    This matter comes before the Court on Defendant Secretary of the Navy's ("the

14 Navy") motion for summary judgment. Dkt. 18. The Court has considered the pleadings

15 filed in support of and in opposition to the motion and the remainder of the file and

16 hereby grants in part and denies in part the motion for the reasons stated herein.

17                    **I.   PROCEDURAL HISTORY**

18    On November 30, 2018, Plaintiff Keith Clark ("Clark") filed this case against the

19 Navy alleging two claims of race discrimination and retaliation in violation of Title VII

20 of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* ("Title VII"). Dkt. 1. On May 7,

21

22       [1] Kenneth J. Braithwaite was sworn in as Secretary of the Navy on May 29, 2020. Therefore, he is automatically substituted in his official capacity as the proper defendant pursuant to Fed. R. Civ. P. 25.

2019, this Court granted leave for Clark to file an amended complaint. Dkt. 13. On May 7, 2019, Clark filed his amended complaint to include an additional cause of action for sex discrimination or retaliation in violation of Title VII. Dkt. 14.

On May 14, 2020, the Navy moved for summary judgment. Dkt. 18. On June 3, 2020, Clark responded. Dkt. 25. On June 9, 2020, the Navy replied. Dkt. 27.

In his response, Clark states that he only intends to move forward on his claim for retaliatory demotion in violation of Title VII (Count 2). Dkt. 25 at 1. The Court will therefore only address the factual background and arguments relevant to this claim. The Court grants the Navy's motion for summary judgment on Clark's two remaining claims.

## II.   FACTUAL BACKGROUND

Clark, an African American, was hired by the Navy in 2004 as a Painter Helper in Shop 71 at the Puget Sound Naval Shipyard ("PSNS"). Dkt. 20-1 ("Clark Depo.") at 4. In October 2010, he was promoted to a temporary supervisor position. *Id.* at 5. Clark's temporary promotion was not to exceed ("NTE") one year, though the position could be extended or ended early. *Id.* At the end of Clark's first NTE supervisor term, he was returned to a non-supervisor status because of a lesser demand for work in the shipyard. *Id.* at 7. In 2012, Clark states that Shop 71 put out a call for employees to apply for supervisor positions and that he applied but was not selected. Dkt. 25 at 2. On December 19, 2012, Clark filed a formal complaint with Defendant's Equal Employment Opportunity ("EEO") office, alleging that on the basis of his race, color, and age he was discriminated against when he was not selected for the position of Supervisory Painter on August 26, 2012. Dkt. 26-2. The EEO Agency investigated his claim and enrolled Clark

1  in an Independent Development Plan with the goal of helping him reach supervisor

2  status. Dkt. 26-3.

3    Clark was again promoted to a temporary supervisor position in 2014, effective

4  March 2014 through March 21, 2015. Clark Depo. at 11. The promotion was extended for

5  another year in 2015 and again in 2016. *Id.* at 12. Clark states that he became concerned

6  about the third NTE extension in 2016 because he was the only African American in his

7  promotion class and all other temporary supervisors in his class had been made

8  permanent at the end of two NTE years. *Id.* at 16; Dkt. 25 at 3.

9    In May 2016, PSNS employee Kevin Horton ("Horton") was informed that he

10  would be assigned to Clark's crew and under Clark's supervision. Dkt. 19 at 2. Horton

11  notified Deena Mead ("Mead"), Shop 71's resource manager, that he would not work

12  under Clark because Clark had called him a derogatory slur for someone who is

13  Caucasian but tries to emulate African-American culture. *Id.* Horton also reported that

14  Clark told him that if Horton won the lottery, Clark would pay for him to have a skin

15  graft to change the color of his skin from white to black. *Id.* After hearing the allegations,

16  Mead directed Horton to write a statement of fact, and based upon Horton's statement of

17  fact, the Navy determined it should conduct an investigation into Clark's conduct. *Id.*

18    The Navy tasked Christopher Wheeler ("Wheeler"), a third-level supervisor

19  outside of Clark's chain of command, to investigate the allegations against Clark. *Id.*;

20  Dkt. 20-2 ("Wheeler Depo.") at 4. Wheeler collected written statements from fourteen

21  employees: one employee corroborated that he heard Clark call Horton the derogatory

22  slur, and two other employees also reported that Clark had made insensitive and

1    inappropriate remarks, often remarking on how many people a female crew member had

2    sex with. *See* Dkt. 20-1 at 38–56. Wheeler also interviewed Clark, who denied using the

3    slur but acknowledged that he might have said the word at one point. *Id.* at 59.

4         Wheeler summarized his findings in a written report dated June 2, 2016. His report

5    concluded that Clark was guilty of offensive behavior and found that Horton was

6    credible. *Id.* at 36. Wheeler's report additionally found that one employee of the fourteen

7    interviewed exaggerated his allegations against Clark because Clark had previously

8    criticized that employee. *Id.* Wheeler concluded that he believed "there is some truth to

9    the accusation that Mr. Clark crossed the line with his joking and inappropriate comments

10   that were to some members of his crew." *Id.* He further stated that "Clark needs to

11   understand he is a supervisor and this type of behavior will not be tolerated." *Id.*

12        Clark states that he met with Wheeler on June 26, 2016 and that Wheeler told him

13   that the allegations amounted to "a bunch of made up BS." Dkt. 25 at 4. However,

14   Wheeler testified that he provided the report to Michael Riedel ("Riedel"), the acting

15   Shop 71 superintendent, within a few weeks after his report was finalized. Wheeler Depo.

16   at 8. Riedel states that he received Wheeler's report in early August 2016 and that he

17   does not know why there was a delay between when Wheeler completed the report and

18   when Riedel received it. Dkt. 20-3 ("Riedel Depo.") at 11–12. Clark contends that Riedel

19   purposefully took no action on the report "for months." Dkt. 25 at 4.

20        Clark next states that on August 3, 2016 he met with Shop 71's acting

21   superintendent, Kevin Jones ("Jones"), about an unrelated matter concerning one of

22   Clark's employees. Clark Depo. at 10. At the end on the meeting, Clark states that he

1    brought up his concerns about having been not been made a permanent supervisor with

2    the rest of his cohort after he had served two years in an NTE status. *Id.* Clark contends

3    that he believed that there was a shop policy that supervisors where supposed to

4    automatically be made permanent after two successful year long NTE assignments. *Id.*

5    He states that he told Jones in this meeting that his race was the reason that all the other

6    temporary supervisors had been made permanent and he had not. Dkt. 25 at 5. This was

7    the first known instance of Clark raising his concerns about discrimination in not

8    becoming a permanent supervisor.

9           The parties dispute the sequence of events following Clark's meeting with Jones.

10    Clark contends that after he lodged his complaint to Jones, Riedel spoke with Jones and

11    then conferred with Mead. Clark states that Riedel and Mead "dredged up the old

12    investigation report from [] Wheeler that had lain dormant for months." *Id.* He states that

13    it was his conversation with Jones on August 3 that ultimately influenced Riedel and

14    Mead's decision to suspend him for seven days and demote him from his supervisor

15    position. The Navy, on the other hand, contends that the suspension and demotion was

16    routine following Wheeler's investigation and report. The Navy states that, after Wheeler

17    issued his report, he met with Riedel and Meade and explained that although some details

18    may have been exaggerated, the initial complaint against Clark was valid, there was

19    evidence of significant issues with Clark's leadership, and Wheeler would not feel

20    comfortable with Clark supervising a crew. Wheeler Depo. at 13–14. Wheeler

21    additionally spoke with Lisa Ames, the Administrative Officer for shops, about the

22    investigation on July 6, 2016. *Id.* at 5. The Navy contends that Lisa Ames told Wheeler in

1  an email that if any of the allegations against Clark were true, then Clark should no

2  longer be a supervisor. *Id.*

3      The Navy states that Riedel made the decision to cancel Clark's temporary

4  promotion based on Clark's conduct issues after an independent review of the statements

5  of fact and Wheeler's investigation report. Riedel Depo. at 10. Mead directed Human

6  Resources to demote Clark and suspend him for seven days on August 4, 2016. Dkt. 26-

7  4; Dkt. 26-7. Clark's demotion was effective August 11, 2016. Dkt. 19 at 3. Following

8  his demotion and supervision, Clark signed an informal EEO complaint alleging his race

9  discrimination claim on August 18, 2016. A Federal Administrative Judge ultimately

10  granted the Navy's motion for summary judgment, finding that Clark was unable to

11  establish that his demotion was because of his race or prior EEO activity. Dkt. 19-8.

## III.  DISCUSSION

13      The Navy moves for summary judgment on Clark's retaliation claim related to his

14  demotion, arguing that Plaintiff cannot establish a prima facie case of retaliation because

15  there is no causal link between any protected activity and the cancellation of his

16  temporary promotion.

17  **A.      Summary Judgment Standard**

18      Summary judgment is proper only if the pleadings, the discovery and disclosure

19  materials on file, and any affidavits show that there is no genuine issue as to any material

20  fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a),

21  (c). The moving party is entitled to judgment as a matter of law when the nonmoving

22  party fails to make a sufficient showing on an essential element of a claim in the case on

1    which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S.

2    317, 323 (1986).  There is no genuine issue of fact for trial where the record, taken as a

3    whole, could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita*

4    *Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (nonmoving party must

5    present specific, significant probative evidence, not simply "some metaphysical doubt").

6    Conversely, a genuine dispute over a material fact exists if there is sufficient evidence

7    supporting the claimed factual dispute, requiring a judge or jury to resolve the differing

8    versions of the truth.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 253 (1986); *T.W.*

9    *Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

10           The determination of the existence of a material fact is often a close question.  The

11   Court must consider the substantive evidentiary burden that the nonmoving party must

12   meet at trial—e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477

13   U.S. at 254; *T.W. Elec. Serv., Inc*., 809 F.2d at 630.  The Court must resolve any factual

14   issues of controversy in favor of the nonmoving party only when the facts specifically

15   attested by that party contradict facts specifically attested by the moving party.  The

16   nonmoving party may not merely state that it will discredit the moving party's evidence

17   at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W.*

18   *Elec. Serv., Inc*., 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255).  Conclusory,

19   nonspecific statements in affidavits are not sufficient, and missing facts will not be

20   presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

21

22

**B.      Merits**

There is a three-step burden-shifting framework for considering summary judgment in an employment retaliation case. *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). To create a triable issue, the plaintiff first must establish a prima facie case by showing "(1) involvement in a protected activity, (2) an adverse employment action[,] and (3) a causal link between the two." *Id.* Second, the burden shifts to the defendant to present a legitimate reason for the adverse employment action. *Id.* Third, the burden shifts back to the plaintiff to "demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext." *Id.* "Only then does the case proceed beyond the summary judgment stage." *Id.* A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). "Circumstantial evidence of pretext must be specific and substantial in order to survive summary judgment." *Bergene v. Salt River Project Agr. Imp. & Power Dist.,* 272 F.3d 1136, 1142 (9th Cir. 2001).

Regarding the causation standard, the Navy argues that Clark must show his protected status was the but-for cause of his suspension and demotion. Dkt. 18 at 15–16 (*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). However, the Navy argues that under either a but-for or a motivating factor standard, Clark does not meet his burden to show causation between his protected activity and his demotion. *Id*.

1   The Court previously determined that the causation standard for a federal

2   employee's retaliation claim under 29 U.S.C. § 2000e-16 is motivating factor and not

3   but-for. *Rosales v. Spencer*, No. C17-5781 BHS, 2019 WL 6913523, at *2–3 (W.D.

4   Wash. Dec. 19, 2019) (citing *Forman v. Small*, 271 F.3d 285, 296–97 (D.C. Cir. 2001)

5   (reasoning that under broad statutory "made free from" language in the Age

6   Discrimination in Employment Act, 29 U.S.C. § 633(a), retaliation based on underlying

7   complaints of status-based discrimination is construed more broadly in the federal

8   sector)). The Court reasoned that "made free from" language in 29 U.S.C. § 2000e-16

9   applicable to discrimination based on race, color, religion, sex, or national origin should

10  be applied to retaliation claims "consistent with Congress's mandate that federal

11  employees shall be free from any discrimination whether it is a motivating factor in an

12  adverse decision or the reason for the adverse decision." *Id*. at *3.

13      In *Babb v. Wilkie*, 140 S. Ct. 1168, 1171 (2020), the Supreme Court held that in a

14  discrimination claim under § 633a(a), the "shall be made free from any discrimination

15  based on age" language applicable to federal employees does not require a but-for

16  causation standard. Instead, "age must be the but-for cause of *differential treatment*,

17  not . . . a but-for cause of the *ultimate decision*." *Id*.

18      Clark argues that he was retaliated against by Riedel because Clark asked his

19  supervisor, Jones, on August 3, 2016 if the reason he had not been promoted to

20  permanent supervisor was because of his race. Dkt. 25 at 13. The parties agree that Clark

21  engaged in a protected activity and that there was adverse employment action, i.e. Clark's

1  demotion and suspension, but disagree as to whether there is causation between the

2  protected activity and the adverse employment action.

3      The Court finds that Clark has established a prima facie case of causation. He

4  argues that (1) Riedel was a responding official to Clark's 2012 EEO complaint[2] and that

5  complaint created animus in Riedel against Clark; (2) Riedel admitted to speaking with

6  Jones on the day of, or the day after, Clark made his discrimination complaint to Jones;

7  (3) Wheeler's investigation had lain dormant for months and was acted upon within hours

8  of Clark's complaint of discrimination; and (4) proximity in time between the complaint

9  and decision to demote was a matter of hours. These allegations are enough to establish

10  causation between Clark's protected activity and demotion, thus establishing a prima

11  facie case of retaliation.

12      Since Clark has established a prima facie case of retaliation, the Navy may then

13  show a legitimate reason for demoting Clark. *Brooks*, 229 F.3d at 928. The Navy argues

14  that a neutral investigator read witness statements and conducted interviews following the

15  allegation of Clark's harassment of his subordinates and concluded that Clark had

16  engaged in offensive behavior. Then the Navy argues that Riedel, the decision maker,

17  independently evaluated the evidence and concluded that Clark had engaged in

18  _____

19      [2] The Navy objects to Clark's use of the EEO Report, arguing that the document has not been authenticated as required by Fed. R. Evid. 901(a) and that the document is hearsay. Dkt. 27 at 5. In

20  *Plummer v. Western International Hotels Co.*, the Ninth Circuit held that a plaintiff has a "right to introduce an EEOC probable cause determination in a Title VII lawsuit." 656 F.2d 502, 505 (9th Cir. 1981). And while *Plummer*'s rule does not apply to all EEOC determinations, the Ninth Circuit has also held that the district court should exercise its discretion to admit or exclude an EEOC letter of violation.

21  *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1161 (9th Cir. 2010). The Court finds that the EEO Report is substantially similar to an EEOC letter of violation, and the Navy has not shown prejudice otherwise to

22  warrant the EEO Report's exclusion.

1    misconduct warranting demotion. The Ninth Circuit had held that violation of a

2    harassment policy is a valid reason to punish an employee, so long as there is not pretext

3    to the punishment. *See, e.g.*, *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 745–46 (9th Cir.

4    2004). Additionally, Riedel testified that he did not speak to Jones about Clark's

5    protected activity prior to his decision to demote Clark. Riedel Depo. at 16. While Clark

6    argues that Wheeler told him that the allegations "were a bunch of made up BS," Wheeler

7    still wrote in his report that Clark was guilty of misconduct and provided that report to

8    Riedel. The Navy argues that Wheeler's report stated that Clark had engaged in offensive

9    conduct and therefore the Navy had a legitimate reason to demote Clark based on this

10   report.

11           Clark may then refute the Navy's legitimate reason by showing pretext. It is not

12   enough for an employee to establish a prima facie case, the employee must produce

13   "specific, substantial evidence of pretext." *Bardley v. Harcourt, Brace & Co.*, 104 F.3d

14   267, 270 (9th Cir. 1996) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir.

15   1994)). Clark has done so here, providing evidence of Riedel's lack of credibility and the

16   temporal proximity between the protected activity and the demotion. First, Riedel

17   testified that he spoke with Jones on the day of Clark's demotion to communicate his

18   decision to demote Clark, but he further testified that he had no knowledge of the alleged

19   conversation between Clark and Jones prior to his conversation with Jones on the day of

20   the demotion. Riedel Depo. at 16. However, while Riedel testified under penalty of

21   perjury, Clark has put his credibility into issue. In Riedel's deposition, Riedel testified

22   that he did not know that Clark had ever engaged in an EEO activity before, despite his

involvement in Clark's 2012 EEO investigation. Riedel Depo. at 12–15; *see also* Dkt. 26-2. This allegation of dishonesty puts Riedel's credibility as a witness at issue. A witness's credibility and honesty are determinations for the jury. *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 147 (2000).

Next, Clark provides evidence of the timing between the protected activity and his demotion. He argues that Wheeler submitted his report around two weeks after June 2 but that Riedel did not act on the complaint until the day after Clark engaged in protected activity. The Wheeler Report lay dormant for approximately six weeks, which Clark alleges is an inordinate amount of time, and the Navy has not shown that this period of time between finalization and action on an investigative report is the usual course of dealing. Additionally, the timing one day between the protected activity and demotion can give rise to an inference of pretext. *See, e.g.*, *Miller v. Faichild Indus., Inc.*, 797 F.2d 727, 731–32 (9th Cir. 1986) (finding two months between protected action and adverse employment action was sufficient to establish pretext). The timing alone raises a possible inference of retaliatory motive by the Navy. Credibility determinations, weighing of the evidence, and inferences from facts are for a jury. *Anderson*, 477 U.S. at 255. Clark has therefore shown circumstantial evidence of pretext to his demotion and has carried his burden at this stage.

Clark has carried his burden in establishing his prima facie case of retaliation under Title VII; and if the Navy had a legitimate reason for the demotion, Clark has created triable issues of fact regarding pretext.

1

## IV.   ORDER

2

Therefore, it is hereby **ORDERED** that Defendant Kenneth J. Braithwaite's

3

motion for summary judgment, Dkt. 18, is **GRANTED** in part and **DENIED** in part.

4

Dated this 21st day of September, 2020.

5

6

_____

7

BENJAMIN H. SETTLE
United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22